NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROBERT BRESLOW & MONICA BRESLOW,<br>    *Plaintiffs*,<br><br>    v.<br><br>JOHN H. KLEIN,<br>    *Defendant*. | Civil Action No. 17-6912<br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

The issue pending before the Court is whether a forum selection clause in a company's operating agreement applies, and, if so, whether this matter should be dismissed as a result. Defendant John Klein ("Defendant") moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for *forum non conveniens*. D.E. 9. In support, Defendant relies on a forum selection clause in an agreement with Plaintiffs. Plaintiffs Robert and Monica Breslow (collectively "Plaintiffs") filed a brief in opposition, D.E. 10, to which Defendant replied. D.E. 12.[1] The Court reviewed the submissions in support and in opposition and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendant's motion is **GRANTED** on *forum non conveniens* grounds but the matter is not dismissed. Instead, this case is transferred to the United States District Court for the District of Delaware.

---

[1] In this Opinion, Defendant's motion to dismiss (D.E. 9) will be referred to as "Def. Brf." Plaintiffs' brief in opposition (D.E. 10) will be referred to as "Pl. Opp." Defendant's reply brief (D.E. 12) will be referred to as "Def. Rep."

## I.    BACKGROUND

The Parties and the Court's Jurisdiction

Cambridge Therapeutic Technologies, LLC ("CTT") is a pharmaceutical company specializing in the packaging and delivery of medication to patients. Complaint ("Compl.") ¶ 2. CTT is a Delaware limited liability company with its principal place of business in New Jersey. *Id.* ¶ 17. Defendant Klein is the Chief Executive Officer ("CEO") of CTT and serves as Chairman of CTT's Board of Managers. *Id.* ¶ 16. Barry Posner was the Executive President at CTT. *Id.* ¶ 19. At all relevant times, Posner served as Klein's agent in discussions with Plaintiffs about their investment in CTT. *Id.* Further, at all relevant times up to June 9, 2017, Posner served as Klein's designee on CTT's Board of Managers. *Id.*

Plaintiffs Monica and Robert Breslow are Illinois citizens. *Id.* ¶¶ 14-15. Marc Wasserman is the Chief Financial Officer ("CFO") and an Executive Vice President for the Breslow Forsythe Group, LLC. *Id.* ¶ 18. At all relevant times, Wasserman served as the Breslows' agent in discussions with Defendant about the Breslows' investment in CTT. *Id.* Wasserman is also the Breslows' designee on CTT's Board of Managers. *Id.*

This case is based upon diversity jurisdiction, under 28 U.S.C. § 1332(a), because Plaintiffs are Illinois citizens and Defendant Klein is a New Jersey citizen. The amount in controversy exceeds $75,000.

The Breslows' CTT Investment

The crux of Plaintiffs' case is that Klein made three material misrepresentations to them in order to get them to invest in CTT: (1) that Klein was the founder and sole owner of CTT and that he had personally invested $11 million in the business; (2) that CTT owned New Drug Application 50-824 ("NDA 50-824"); and (3) that Klein misrepresented CTT's financial health.

In April 2016, an investment banker, Jeremy Adamic, acting on behalf of Klein, approached the Breslows about the possibility of investing in CTT. *Id.* ¶ 29. Klein directed Adamic to present the Breslows with a written presentation that outlined his plans for CTT. *Id.* ¶ 30. In this presentation, Klein made several representations, including that he had personally invested $11 million in the company. *Id.* ¶ 32. The presentation also "stated that CTT had developed and was to begin commercializing a propriety solution that enables doctors to dispense safely and directly a variety of pre-packaged, calendarized, generic-drug combinations." *Id.* ¶ 33.

After this introduction to CTT, the Breslows entered into discussions on whether to invest in CTT. During these discussions, Klein and his agent, Posner, made many representations to the Breslows and their agent, Wasserman. Klein stated (1) that he was the founder and sole owner of CTT and that he had, in fact, invested the $11 million in CTT. *Id.* ¶¶ 4, 36, 38; and (2) that CTT owned all intellectual-property rights to certain property necessary to CTT's business, including that CTT owned NDA 50-824, which gave CTT the exclusive rights to sell a combined package of three commonly handled prescription drugs, *Id.* ¶¶ 5, 37, 38. As to the NDA, Klein personally guaranteed that CTT owned NDA 50-824 and other intellectual property in two written contacts, and agreed to indemnify the Breslows for any breach of those guarantees. *Id.* ¶ 6.

Finally, Klein represented that CTT was a profitable and financially expanding company, which had brought in at least $2 million in revenue in March 2016 and $2.8 million in April 2016. *Id.* ¶ 39. To that end, Klein told Wasserman that CTT was increasing sales in its "non-core" product line and that revenue was already in the $5 to 6 million range. *Id.* ¶ 68. Posner specifically represented that CTT would continue selling two non-core products, which he claimed would generate $10 to 15 million in revenue per month. *Id.* ¶ 69. Klein further asserted that within a brief period of time, CTT had seen significant revenue and cash flow increases from CTT's "core"

business. *Id.* ¶ 7, 39. He informed Wasserman that "CTT would achieve $28-$30 million in revenue in 2016 without any capital infusion, and $400 million in revenue in 2017 with $186 million in cash flows." *Id.*

Relying on all these representations, the Breslows decided to invest in CTT. *Id.* ¶ 24. As part of the investment transaction, the parties executed three agreements on June 15, 2016. *Id.* First, the Breslows, Klein, and CTT entered into the Unit Purchase Agreement ("UPA"). *Id.* ¶¶ 24, 60. In Section 3.9 of the UPA, Klein personally warranted that CTT owned, or had license to use, NDA 50-824 as well as other intellectual property. *Id.* Second, the Breslows and Klein entered into a letter agreement ("LA"). In the LA, Klein affirmed his representations made in the UPA concerning CTT's ownership of, or license to use, NDA 50-824, and agreed to indemnify the Breslows for any breach of those representations. *Id.* ¶¶ 25, 61. Klein also reaffirmed that he was CTT's sole owner. *Id.* ¶ 45. Third, and finally, the Breslows, Klein, and CTT entered in an Operating Agreement ("OA"), that they subsequently amended (the "AOA"). *Id.* ¶ 26.

Per these agreements, the Breslows invested a total of $12.5 million in CTT. *Id.* ¶ 34. The Breslows invested the first $7.5 million on June 15, 2016. They then invested another $5 million on July 20, 2016. *Id.* ¶ 27. Through this investment, the Breslows received 20,000 Class A Units in CTT. *Id.*

<u>The Underlying Agreements</u>[2]

*(1) The Unit Purchase Agreement ("UPA")*

On June 15, 2016 the Breslows, Klein, and CTT entered into the UPA. D.E 9-3 (UPA, Intro.). Klein was included as to the provisions in Sections 3.9 and 7.2 of the UPA. *Id.* Subject to the terms of the UPA, the Breslows agreed to pay $12.5 million, in two separate payments, for 20,000 Class A units in CTT. *Id.* (UPA, § 1.26). Several sections of the UPA reference the OA. *Id.* (UPA, §§ 1.3; 1.26; 3.3; 5.1 (Ex. A)). The UPA also refers to the LA. *Id.* (UPA, § 5.7).

Section 3 of the UPA sets forth representations and warranties of CTT.[3] At issue here, is Section 3.9, which provides in relevant part as follows:

---

[2] When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993). Here, the agreements referred to are expressly referenced in the Complaint, and neither Plaintiffs nor Defendant contest their authenticity.

[3] The introduction to Section 3 of the UPA provides in relevant part:

> <u>Representations and Warranties of the Company</u>. Except as set forth on the Disclosure Schedule (the "<u>Disclosure Schedule</u>"), which exception shall be deemed to be representations and warranties as if made under this <u>Section 3</u>, the Company hereby makes the following representations and warranties (and [Klein] jointly and severally with the Company makes the representations and warranties in Section 3.9) to the [Breslows] as the First Closing Date and, if the Second Closing occurs, represents and warrants that they will be true and correct on the Second Closing Date. No investigation by the Investor shall affect the representations and warranties of the Company under this Agreement or contained in any document, certificate or other writing furnished or to be furnished to the [Breslows] in connection with the transaction contemplated hereby and such representations and warranties shall not be affected or deemed waived by reason of the face that the

Intellectual Property

    (a) Schedule 3.9 contains a list of all registered copyrights, unregistered and registered trademarks, patents and patent applications owned, or under license to, the Company other than "off the shelf" licenses of software used for general operations (e.g. Microsoft Word and Excel), specifying as to each the nature and owner of such rights. The items required to be listed on Schedule 3.9, together with all know-how, trade secrets, confidential or proprietary information, inventions, discoveries, technical information, data, results, formulations, recipes, notebooks, research and development reports and records, studies, reports, correspondence (including correspondence and related meeting notes with the FDA), and similar documents relating to the *investigational new drug applications and new drugs application listen on* Schedule 3.9 are defined herein as "Company IP Rights." . . . No Company IP Rights are involved in any interference or re-examination or cancellation or opposition or abandonment proceeding, and the Company has not been notified or alerted that any such proceeding will hereafter be commenced.

    (b) The Company is not, and has not been, a defendant in any action, suit, investigation or proceeding relating to, and has not otherwise been notified on, nor to the knowledge of the Company is there any basis for, any alleged claim or allegation of infringement relating to the Company IP Rights. Neither the Company nor the Company IP Rights have infringed or are infringing on the intellectual property rights of any third party[.] . . .

    (c) Subject to license grants listed in Schedule 3.9, the Company possesses the full ownership interest in and there are no Liens on, such Company IP Rights.

    . . .

    (g) The Company has taken all actions reasonably necessary to protect the Company IP Rights.

---

    [Breslows] knew or should have known that any of the same is or might be inaccurate in any respect.

Def. Brf.; D.E 9-3 (UPA, § 3). Section 4.3 reaffirms Section 3, stating in relevant part: "The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 3 of this Agreement or the right of the Investor to rely thereon." *Id.* (UPA, § 4.3).

*Id.* (UPA, § 3.9 (emphasis added)). Critically, Section 3.9 covers NDA 50-824.

Section 7.2 of the UPA provides when Klein can be paid back a $3 million loan he made to CTT. In particular, this section explains that prior to any repayment Klein must provide the Breslows with "documented proof of investment into the Company of at least $11 million." *Id.* (UPA, § 7.2).

Section 8.3 provides that Delaware law governs the UPA. *Id.* (UPA, § 8.3). Section 8.12 further provides as follows: "Entire Agreement. This Agreement *and the documents referred to herein constitute the entire agreement* and the understanding among the parties hereto with respect to the subject matter hereof, and supercede[sic] all prior negotiations and agreements, whether oral or written, with respect to the subject matter hereof." *Id.* (UPA, § 8.12 (emphasis added)). As noted, both the OA and LA are expressly referenced in the UPA. No section of the UPA contains a forum selection clause. The signees of the UPA are Barry Posner for CTT, the Breslows, and Klein. *Id.* (UPA, pg. 20).

*(2) The Letter Agreement ("LA")*

The LA explicitly refers the UPA and is stated to be "Indemnification for Intellectual Property Issues[.]" D.E. 9-4 (LA). In the LA, Klein agreed to indemnify and hold harmless the Breslows for any losses incurred as to Section 3.0 in the UPA. *Id.* (LA at 1). Specifically, the LA provides as follows:

> As an inducement to the [Breslows] to purchase Class A units, and as a condition to such purchase, [Klein] hereby agrees to indemnify, defend, and hold harmless the [Breslows] and the Company against any and all losses, claims, damages, expenses and liabilities, whether joint or several (collectively "Liabilities") arising out of or related to any breach or misrepresentation in the representation and warranties contained in Section 3.9 of the [UPA], all of which representations and warranties survive the date hereof and the consumation of the transactions contemplated by the [UPA].

*Id.* In the LA, Klein also reaffirmed that he "is the founder and owner of 100% of the Company's equity prior to the Investors purchase of the Company Class A Units." *Id.* The LA does not contain a choice of law provision or forum selection clause. The signees of the LA are the Breslows and Klein. *Id.*

### (3) The Operating Agreement ("OA") and the Amended Operating Agreement ("AOA")

#### a. Initial Operating Agreement

On June 15, 2016, CTT and its members (including Klein and the Breslows) entered into an operating agreement (the "OA") for CTT. The OA was signed on the same day as the UPA and the LA. The OA's introduction and recitals reference the UPA, Plaintiffs, and Defendant. These provisions provide that prior to the securities sale, only Klein held an ownership interest in CTT. The OA further indicates that after CTT and the Breslows entered into the UPA, the Breslows also became members of CTT. The OA provides that, to extent lawful in Delaware, it is the document that would govern the affairs of CTT. D.E. 9-5 (OA, Intro. & Recitals).

Section 2.2 of the OA provides that the OA "may from time to time be amended" and the process for any such amendment. *Id.* (OA, § 2.2). Further, Section 2.2 makes clear that no provision in the OA superseded the UPA. *Id.* Like the UPA, Delaware law governs the OA. *Id.* (OA, § 18.6). The OA also contains a Delaware forum selection clause.[4] The signees of the OA were Posner for CTT, Klein, and the Breslows. *See id.* (OA).

---

[4] Section 18.11 of the OA provides in relevant part:

> Dispute Resolution. The parties: (a) hereby irrevocably and
> unconditionally submit to the jurisdiction of the state courts of
> Delaware and to the jurisdiction of the United States District Court
> for the District of Delaware for the purpose of any suit, action or
> other proceeding arising out of or based upon this Agreement; (b)
> agree not to commence any suit, action or other proceeding arising
> out of or based upon this Agreement except in the state courts of

### b. *Amended Operating Agreement*

A few months later, in September 2016, CTT and its members (including Klein and the Breslows) entered into an amended operating agreement (the "AOA") for CTT. D.E. 9-3 (AOA, Intro.). The AOA provides that the purchase of CTT securities originally closed on June 15, 2016 when the Breslows, Klein, and CTT entered into the UPA and the original OA. *Id.* (AOA, Recitals).

The AOA also provides numerous definitions. A "party" means a party to the AOA. *Id.* (AOA, Definitions). A "proceeding" means:

> [A]ny judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator, or governmental agency may enter a judgment, order, decree or other determination which, if not appealed and reversed, would be binding upon the Company, a Member or other Person subject to the jurisdiction of such court, arbitrator, or governmental agency.

*Id.* And an "umbrella agreement" means the Umbrella Agreement, attached to the AOA as Exhibit C. *Id.* In Section 2.2 of the AOA, the parties agree that the AOA and Umbrella Agreement are "the sole source of agreement" between them as to the AOA. Def. Brf.; 9-3 (AOA, § 2.2). Section 2.2 further provides the rights and duties of the parties and reaffirms that the AOA does not supersede the UPA. *Id.*

Section 18.6 provides that the AOA is governed by Delaware law. *Id.* (AOA, § 18.6). Finally, Section 18.11 states the parties' agreement as to dispute resolution. It provides:

> <u>Dispute Resolution</u>. The Parties hereby irrevocably and unconditionally (a) agree that all Proceedings (in contract, tort or otherwise) arising out of or relating to this Agreement, the

---

Delaware or in the United States District Court for the District of Delaware[.]

D.E. 9-5 (OA, § 18.11).

transactions contemplated hereby or the relationships among the Parties hereunder and any disputes with respect to the foregoing shall be commenced and prosecuted exclusively in the Court of Chancery and any appellate courts therefrom within the State of Delaware (or if the Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware) (collectively, the "Delaware Courts"); (b) submit to the exclusive personal jurisdiction of any of the Delaware Courts in respect of any such Proceeding; (c) agree not to commence any such Proceeding except in the Delaware Courts; (d) waive, to the fullest extent they may legally and effectively do so, and agree not to assert, by way of motion, as a defense, or otherwise, in any such Proceeding, any claim that it is not subject personally to the jurisdiction of the Delaware Courts, that its property is exempt or immune from attachment or execution, to the laying of venue of any such Proceeding in the Delaware Courts, that such Proceeding is brought in an inconvenient forum, that the venue of such Proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such Delaware Court. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THE FOREGOING WAIVERS WITH ITS LEGAL COUNSEL, UNDERSTANDS AND HAS CONSIDERED THE IMPLICATION OF SUCH WAIVERS AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY MAKES THE FOREGOING FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

*Id.* (AOA, § 18.11) (emphasis in original). The signees of the AOA are Klein for CTT, Klein personally, the Breslows, Barry Posner, Marc Wasserman, and others. *See id.* (AOA).

Klein's Alleged Misrepresentations

A little over a year after investing in CTT, the Breslows came to believe that Klein had deceived them to induce their investment. For example, after the Breslows' first investment of $7.5 million in CTT, Klein provided them with CTT's financial statement. The statement, from January 1, 2016 to May 31, 2016, showed a net income of $3,165,000 and net liabilities of $7,771,000. However, just a month after the Breslows' second investment of another $5 million in CTT, Klein provided the Breslows with a second CTT financial statement. This statement

showed a net income of $748,946 and net liabilities at over $15 million. *Id.* ¶ 74. The Breslows add that many of CTT's represented accounts receivable are not collectible. *Id.* ¶ 75. The Breslows further allege that CTT's business fell after 2016. According to the Breslows, the sales of "noncore" CTT products decreased to zero by September 2016. And the CTT combined package of three commonly handled prescription drugs resulted in less than $50,000 in revenue since October 1, 2016. *Id.* ¶ 13.

As noted, in addition to the financial health of CT, the Breslows also submit that Klein was not CTT's sole shareholder and that Klein never invested $11 million into CTT. *Id.* ¶ 10. Plaintiffs, further, claim that CTT does not own ND 50-824, which is instead owned by a separate company in which Klein has a 34% interest. *Id.* ¶¶ 11, 63-65. The Breslows further contend that Klein fraudulently caused CTT repay him $500,000 of a purported $3 million debt. *Id.* ¶¶ 50-52.

Procedural History

Plaintiffs filed their Complaint on September 8, 2017. D.E. 1. The Complaint alleges four counts: fraud and fraudulent inducement (Count I); breach of contract of Section 3.9 of the UPA (Count II); breach of contract of the LA (Count III); and federal securities fraud (Count IV). Defendant's current motion followed. Defendant's primary argument is that the forum selection clause in the AOA controls so that this matter must be dismissed due to *forum non conveniens*.

## II.    LAW & ANALYSIS

### A.    Legal Standard

As noted, Plaintiffs invoke the Court's diversity jurisdiction. Defendant moves for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) based on *forum non conveniens*. Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" In *Atlantic Marine*

*Construction Company v. United States District Court*, the United States Supreme Court expressly indicated that it was not determining whether Rule 12(b)(6) was an appropriate vehicle for a motion to dismiss pursuant to *forum non conveniens*. 571 U.S. 49, 61 (2013). The Court, in fact, indicated that if a defendant used 12(b)(6) in such circumstances, it would be "sensible" for the defendant to also move to dismiss based on *forum non conveniens*. *Id.* n. 4.

However, in a recent nonprecedential opinion, the Third Circuit indicated the Rule 12(b)(6) could be used to dismiss a case for *forum non conveniens*. *Podesta v. Hanzel*, 684 F. App'x 213, 216 (3d Cir. 2017) (finding that while a party could move "under 28 U.S.C. § 1404(a) to transfer a case to another federal court based on a valid forum selection clause, a Rule 12(b)(6) dismissal is also an acceptable means of enforcing such a clause when, as here, the clause allows for suit in either a state or federal forum") (citing *Atlantic Marine*, 571 U.S. at 61; *Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d 289, 298 (3d Cir. 2001))). Moreover, the Third Circuit in *Podesta* also instructed that a court should focus on a motion's function, not its caption. *Podesta*, 684 F. App'x at 216 (citing *Turner v. Evers*, 726 F.2d 112, 114 (3d Cir. 1984)). Here, the function of Defendant's motion is clearly a dismissal based on *forum non conveniens*.

Finally, Plaintiffs have not challenged Defendant's use of Rule 12(b)(6). Accordingly, the Court will decide the motion pursuant to Rule 12(b)(6). However, the Court alternately views the motion as one to dismiss pursuant to the *forum non conveniens* doctrine, without reference to Rule 12(b)(6).

## B. Choice of Law

Here, both parties agree that Delaware law applies, although neither side provides much by way of analysis in support. Nevertheless, in light of recent Third Circuit precedent, the Court agrees that Delaware law applies. In *Collins v. Mary Kay, Inc.*, the Third Circuit addressed choice

of law provisions and forum selection clauses. 874 F.3d 176 (3d Cir. 2017). The defendant was a Texas-based cosmetic company. Plaintiff was a New Jersey resident who had worked for the defendant, in various capacities, in New Jersey. *Id.* at 179. The parties had entered into two written agreements. *Id.* Each contained a choice of law provision specifying that Texas law would apply to a relevant dispute. *Id.* Further, each agreement contained a forum selection clause specifying that a Texas state court would have jurisdiction and venue over any such dispute. *Id.* After the parties' business relationship soured, the plaintiff filed a putative class action in the United States District Court for the District of New Jersey. *Id.* The defendant then moved to dismiss the plaintiff's complaint pursuant to both Rule 12(b)(6) and *forum non conveniens*. *Id.* at 180. The district court granted defendant's motion on *forum non conveniens* grounds, finding that Texas was the appropriate forum under the forum selection clauses. *Id.*

On appeal, the Third Circuit addressed the scope of the forum selection clauses. The Circuit affirmed that "a court considering the interpretation of a forum selection clause applies principles of contract law to determine the scope of the clause." *Id.* (citing *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1073 (3d Cir. 1997)). However, before applying contract law and determining the scope of the forum selection clauses, the *Collins* court stated that it had to determine the appropriate law to apply. The Circuit applied the *Erie* doctrine, whereby a federal court sitting in diversity jurisdiction applies state law to substantive issues and federal law to procedural issues. *Id.* at 181 (citing *Erie Railroad v. Tompkins*, 304 U.S. 64, 78 (1938)). Applying *Erie*, the Third Circuit observed that issues concerning *enforcement* of forum selection clauses were subject to federal law. *Id.* The court in *Collins*, by comparison, ruled that issues concerning *interpretation* of such clauses were subject to state law because the analysis called for contract interpretation, a substantive matter. *Id.* at 182. The Circuit added that state law applied

unless the questions of contract law fell within "certain restricted areas," including when "uniquely federal interests" are at stake. *Id.* at 182 (internal quotations omitted).

After determining that state contract law governed their interpretation of the forum selection clauses, the Third Circuit next decided which state's contract law to apply. The Circuit affirmed that in a diversity case, a court looks "to the choice-of-law rules of the forum state—the state in which the District Court sits—in order to decide which body of substantive law to apply to a contract provision, even where the contract contains a choice-of-law clause." *Id.* at 183. Therefore, the *Collins* court applied New Jersey choice-of-law rules even though the underlying agreements indicated that Texas law controlled. *Id.*

The Circuit observed that under New Jersey law, "'when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.'" *Id.* at 183-84 (quoting *Instructional Sys., Inc. v. Comp. Curriculum Corp.*, 130 N.J. 324, 341 (1992)). However, the court in *Collins* noted that New Jersey will not uphold a choice-of-law clause when either of the following two exceptions are present:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Collins*, 874 F.3d at 184 (quoting *Instructional Sys.*, 130 N.J. at 342 (quoting Restatement (Second) of Conflicts of Laws § 187 (Am. Law Inst. 1969))). In light of New Jersey's standard, the Third Circuit found that Texas law applied. *Id.*

In light of the guidance in *Collins*, the Court applies New Jersey choice-of-law rules. Following the New Jersey standard, the parties' contractual choice of Delaware law applies, unless

one of the two noted exceptions is present. The parties do not assert any such exception applies, and the Court finds that the exceptions are inapplicable. To the contrary, both parties agree that Delaware law applies. Further, CTT is a Delaware limited liability company and both parties are members of CTT. Both the UPA and the AOA (as did the OA) provide that Delaware law is the governing law. Therefore, the Court will apply Delaware law in interpreting the forum selection clause in the AOA.

### C. Application of Delaware Law

Having determined that Delaware law applies, the Court turns to the critical issue of the impact of the AOA's forum selection clause. Defendant argues that Plaintiffs' Complaint should be dismissed because a valid forum selection clause exists between the parties, requiring that this matter be heard in Delaware. Def. Brf. at 10.[5] Defendant acknowledges that a court analyzing a motion to dismiss for *forum non conveniens* typically engages in a multi-step analysis. *Id.* However, relying on *Atlantic Marine*, Defendant claims that a court should give a valid forum selection clause controlling weight in all but the most exceptional circumstances. *Id.* at 11. Defendant add that such exceptional circumstances are not present here. *Id.* at 12-17. Defendant concludes that Plaintiffs cannot overcome the presumption in favor of the parties' preselected forum. *Id.* at 17-18.

Plaintiffs, in contrast, argue that their claims do not relate to the AOA are therefore not covered by the AOA's forum selection clause. Pl. Opp. at 6. Rather, Plaintiffs assert that their

---

[5] Throughout his motion to dismiss brief, Defendant cites to a "Delaware Complaint," where Plaintiffs are the defendants and Defendant is one of the plaintiffs. Def. Brf. at 7; D.E. 9-3. The Delaware Complaint's caption reads: *John H. Klein & Cambridge Therapeutic Technologies, LLC v. Marc Wasserman, Robert Breslow, & Monica Breslow.* The Court does not consider the factual allegations or causes of action asserted in the Delaware Complaint for the purposes of deciding this motion.

causes of action against Klein arise out of the UPA and LA, both of which do not contain a forum selection clause. *Id.* at 10. To this end, Plaintiffs claim that the AOA's forum selection clause covers matters related to CTT operations and activities. In comparison, Plaintiffs assert that their claims relate to pre-investment matters and matters addressed in the UPA and LA. *Id.* at 13. To support this argument, Plaintiffs point the Court to *Green Isle Partners, Ltd. v. Ritz-Carlton Hotel Co. L.L.C.*, No. CIV.A.18416, 2000 WL 1788655, at *1 (Del. Ch. Nov. 29, 2000) and *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 702 (Del. Ch. 2014). Finally, Plaintiffs argue that even if the AOA's forum selection clause did apply, the Delaware Court of Chancery would not have jurisdiction over the matter because of the Complaint's federal securities fraud count. Therefore, according to Plaintiffs, Delaware is not a viable alternative forum. *Id.* at 13-14.

Thus, the critical question is whether the AOA's forum selection clause applies to Plaintiffs' claims. That question, in turn, raises the issue of whether the Court should consider the UPA, LA, and AOA together. Under Delaware law, multiple contracts that are "part and parcel of a larger contractual relationship" should be read and interpreted together. *CA, Inc. v. Ingres Corp.*, No. CIV. A. 4300-VCS, 2009 WL 4575009, at *47 (Del. Ch. Dec. 7, 2009), *aff'd*, 8 A.3d 1143 (Del. 2010); *see also Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010) (finding that "contemporaneous documents should be read together"); *Crown Books Corp. v. Bookstop Inc.*, 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters."); *Brastor Mercantile, Ltd. v. Cent. Citrus S/A*, No. 89C-FE-109, 1989 WL 70971, at *4 (Del. Super. Ct. June 6, 1989) (finding that the "correct approach" is to "review the entire document and its language is to be construed as a whole . . .

[t]herefore, all three documents signed on September 23, 1987 must be read as a whole."). Delaware law also supports interpreting multiple contracts together if the contracts cross-reference one another. *Duff v. Innovative Discovery LLC*, No. CIV.A. 7599-VCP, 2012 WL 6096586, at *12 (Del. Ch. Dec. 7, 2012) ("Delaware law holds that where a contract incorporates another contract by reference, the two contracts will be read together as a single contract."); *Brastor Mercantile, Ltd.*, 1989 WL 70971, at *4 ("Utilization of the doctrine of incorporation by reference will avoid a tortured reading of these documents and will, in this Court's opinion, avoid frustrating the parties' intent.").

In light of this guidance, the Court will read the UPA, LA, and the AOA together. Several factors support this decision. To begin, the UPA, LA, and OA were all signed on the same day—June 15, 2016. Further, the UPA references both the LA and the OA. The LA references the UPA. And both the OA and AOA reference the UPA. Indeed, Plaintiffs refer to all relevant agreements in their Complaint, acknowledging that the UPA, LA, and OA were all executed on the same day. Compl. ¶¶ 24-26. Moreover, each agreement concerns Plaintiffs and Defendant as to CTT, and the UPA and AOA address CTT as well. The fact that the OA was later amended does not change this analysis. The OA indicated that it could, in fact, be amended. Further, the AOA expressly and unequivocally indicates that it is meant to take the place of the OA, which was signed on the same day as the UPA and LA. In addition, and as noted, the AOA explicitly references the UPA.

Next, the Court must interpret the three agreements in accordance with Delaware law. The AOA's forum selection clause provides that it covers disputes "arising out of or relating to" the AOA. Delaware law provides for a broad construction of such language. *CA, Inc.*, 2009 WL 4575009, at *46 n. 290 (Del. Ch. Dec. 7, 2009) (finding that in a forum selection clause, "[l]anguage such a "relate to" or "arise out of" is to be read broadly"); *see Elf Atochem N.A. v.*

*Jaffari*, 727 A.2d 286, 294-95 (Del. 1999) (holding that claims under a separate contract were all subsumed under the forum selection clause in the LLC Agreement, which broadly covered any claim "related to" the LLC Agreement). Indeed, under Delaware law, phrases in a forum selection clause, including "arising under," "related to," or "in connection with," . . . "explicitly extend[] beyond the four corners of the contract." *Carder v. Carl M. Freeman Communities, LLC*, No. CIV.A. 3319-VCP, 2009 WL 106510, at *5 (Del. Ch. Jan. 5, 2009).

As noted, the AOA's forum selection clause, Section 18.11, contains the same broad language, specifically the phrase "arising out of or relating to[.]" Further, the clause expressly binds "Parties," which includes Plaintiffs, and applies to "Proceedings," which would include the current suit. The clause also includes the following expansive phrase: "transactions contemplated hereby or relationships among the parties hereunder and any disputes with respect the foregoing shall be commenced and prosecuted exclusively" in the appropriate Delaware court. Thus, the AOA expressly references the relationships among the parties, as does the UPA. Further, the AOA, UPA, and LA all contain language reflecting Plaintiffs' transaction of investing in CTT, which is the heart of this matter. In addition, the forum selection clause indicates that it applies to all proceedings, meaning those "in contract, tort or otherwise[.]" Finally, Plaintiffs and Defendant are sophisticated parties, as referenced in the AOA, and each had counsel during the transaction.[6] In sum, the forum selection clause in the AOA is broad in scope and will be interpreted as such.

Delaware courts have also observed that the legitimate scope of a valid forum selection clause cannot be circumvented by "artful pleadings." *Ashall Homes Ltd.*, 992 A.2d at 1252

---

[6] As referenced in note 3, *supra*, Plaintiffs' sophistication may be irrelevant to any alleged misrepresentations concerning NDA 50-824. The Court is not opining on that provision here. Instead, the Court is noting that a factor favoring an interpretation of the forum selection clause as written – that is, broadly – is that Plaintiffs are otherwise sophisticated persons who were represented in the underlying transaction.

(finding that a "forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship") (quoting *Simon v. Navellier Series Fund*, No. 17734, 2000 WL 1597890, at *2 (Del. Ch. Oct. 19, 2000))). Here, Plaintiffs only assert claims pursuant to UPA and LA, but this type of artful pleading is exactly what Delaware courts have prohibited. Plaintiffs' Complaint, moreover, expressly acknowledges both the OA and AOA. *See* Compl. ¶¶ 24, 26, 43.

Further, and critically, the UPA and LA are silent on the issue of forum selection. Neither the UPA or LA contain such a clause, much less one that conflicts with the AOA's forum selection clause. In such a situation, Delaware courts have found that a related contract's forum selection clause applies. *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (explaining that "in determining which contracts governed the various disputes, the court must consider the entire collection of related contracts, including those that contained forum selection clauses" and finding that "[a]fter considering and interpreting all of the related agreements" the Court of Chancery was correct "in concluding that the agreement that did not contain a forum selection clause did not supersede those that did.").

Plaintiffs point out that the AOA (as did the OA) expressly indicates that the UPA is not superseded by the AOA. Pl. Opp. at 3. *See* Def. Brf.; 9-3 (AOA, § 2.2) (stating that "notwithstanding the foregoing, no provision in the Purchase Agreement is superseded by the Agreement"). Yet, Section 8.12 of the UPA, entitled "Entire Agreement," provides that "[t]his Agreement and *the documents referred to herein constitute the entire agreement*." The UPA expressly references the OA numerous times. *See* D.E. 9-3 (UPA §§ 1.26; 3.2; 3.3; 3.10; 5.1). As a result, the plain language of the UPA also supports a finding that the OA, and the subsequent

AOA, are part and parcel of the UPA. This fact lends further support for finding that the AOA's forum selection clause applies here.

Finally, the cases that Plaintiffs rely on are distinguishable. In *OTK*, 85 A.3d 696, 719–21 (Del. Ch. 2014), the defendant moved to dismiss the matter based on forum selection clause in transaction documents that the plaintiff had never signed, rather the documents concerned an agreement with a third party. Here, Plaintiffs signed the UPA, the LA, the OA, and the AOA.

In *Green Isle*, 2000 WL 1788655, at *1 (Del. Ch. Nov. 29, 2000), the plaintiff sued the defendant pursuant to an operating agreement, and the defendant moved to dismiss based on a forum selection clause in an attornment agreement. There, the plaintiff and defendant's operating agreement related to the plaintiff as owner of the property and the defendant as operator of a hotel project on the property. The attornment agreement, in turn, was between the defendant and the guarantor of the hotel project. It set forth the defendant and the guarantor's rights and duties if the plaintiff became "absent" due to "abandonment, foreclosure, and bankruptcy. *Id.* at *3. While the plaintiff also signed the attornment agreement, its involvement was a "mere statement of present consent[.]" *Id.* Moreover, the attornment agreement did not incorporate the operating agreement. The court in *Green Isle* found that the defendant's attempt apply the forum selection clause in the attornment agreement to the operating agreement "would make even a medieval alchemist blush[.]" *Id.* Therefore, the Delaware Chancery Court concluded that "the subject of this lawsuit cannot be said to in any way, manner or respect "arise out of" the [a]ttornment [a]greement." *Id.* Here, Plaintiffs did not sign the AOA (or the OA) to implement a "mere statement of present consent." Instead, the UPA, the LA, the OA (and later the AOA) cross-reference each other and are the critical documents reflecting the relevant business relationship between Plaintiffs and Defendant as to CTT and Plaintiff's investment therein.

For the foregoing reasons, the Court finds the AOA's forum selection clause applies to the claims alleged in Plaintiffs' Complaint. The forum selection clause is broad and encompasses both the UPA and the LA. Plaintiff's second and third counts allege a breach of the UPA and the LA, respectively. The first and fourth counts are similarly covered by the clause because the counts involve Plaintiffs and Defendant and concern a dispute arising out of their relationship and the underlying transaction.

### D.  Application of the *Forum Non Conveniens* Doctrine

Having determined that claims in the Complaint fall within the purview of the AOA's forum selection clause, the final issue is whether the matter should be dismissed pursuant to the doctrine of *forum non conveniens*. *Atlantic Marine*, discussed in part above, changed the analytical framework for a *forum non conveniens* motion when a valid forum selection clause is involved. In *Atlantic Marine*, Atlantic Marine Construction Company, a Virginia corporation with its principal place of business in Virginia, had "a contract with the United States Army Corps of Engineers to construct a child-development center at Fort Hood in the Western District of Texas." 571 U.S. at 53. Atlantic Marine then entered into a subcontract with J-Crew Management, Inc., a Texas corporation, as to the construction project. *Id.* The subcontract contained a forum selection clause, designating Virginia state court or the Eastern District of Virginia as the only fora in which a suit could be brought. *Id.*

After a disagreement over payment under the subcontract arose, J-Crew sued Atlantic Marine in the Western District of Texas. *Id.* Atlantic Marine then moved to dismiss the suit under 28 § 1406(a) and under Federal Rule of Civil Procedure 12(b)(3). *Id.* The District Court denied Atlantic Marine's motion to dismiss under 28 U.S.C. § 1406(a) and motion to transfer under 28

21

U.S.C. § 1404(a). The Court of Appeals affirmed. *Id.* 53-54. The Supreme Court reversed and remanded the matter. *Id.* at 67-68.

The Supreme Court first found that a party may not enforce a forum selection clause by seeking dismissal under Section 1406(a) or Rule 12(b)(3). *Id.* at 55. The *Atlantic Marine* Court wrote that under either provision, dismissal based on venue is only appropriate when venue is "wrong" or "improper." *Id.* The Court further noted that 28 U.S.C. § 1391, the federal statute governing venue, governs whether venue is "wrong" or "improper." *Id.* Section 1391, further, expressly provides that it exclusively governs venue. *Id.* Thus, the Court found that "whether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the [three] categories of cases listed in § 1391(b)" and that "[a]s a result, a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." *Id.* at 56. The Supreme Court also observed that statutory term "venue" is not synonymous with the word "forum." *Id.* at 56.

The *Atlantic Marine* Court next determined that a forum selection clause can be enforced by way of a motion to transfer under Section 1404(a). *Id.* at 59. The appropriate way to enforce a forum selection clause, the Court ruled, was through the doctrine of *forum non conveniens*. The Court in *Atlantic Marine* explained that "[s]ection 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system[.]" *Id.* at 60. The Court further indicated that "because both § 1404(a) and the *forum non conveniens* doctrine from which it derives entail the same balancing-of-interests standard, courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." *Id.* at 61.

The *Atlantic Marine* Court then stated that when the parties have agreed to a valid forum selection clause, the district court should transfer the matter to the specified forum absent extraordinary factors unrelated to the convenience of the parties. *Id.* at 62. The Supreme Court continued that when the parties' have agreed to a valid forum selection clause, its holding changed the traditional *forum non conveniens* analysis[7] in three ways. *Id.* at 63. First, the plaintiff's choice of forum is given no weight. *Id.* Second, the district court does not consider the parties' private interest factors and, instead, only weighs the parties' public interest factors. *Id.* at 64. Importantly, the party acting in violation of a valid forum selection clause bears the burden of proving the public interest factors. *Id.* at 67. The Supreme Court noted that because the public interest "factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64. Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules." *Id.* at 64.

Applying *Atlantic Marine* here, the Court finds that this matter should be transferred to United States District Court for the District of Delaware. To begin, Plaintiffs' choice of forum,

---

[7] The traditional analysis in the Third Circuit consists of considering the following:

> (1) the amount of deference to be afforded to plaintiffs' choice of forum;
> (2) the availability of an adequate alternative forum where defendants are amenable to process and plaintiffs' claims are cognizable;
> (3) relevant "private interest" factors affecting the convenience of the litigants; and
> (4) relevant "public interest" factors affecting the convenience of the forum.

*Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013).

the District of New Jersey, is entitled to no weight because of the AOA's valid forum selection clause. Further, and for the same reason, the Court does not give any weight to the private interest factors. Moreover, because Plaintiffs are the party who is acting in contravention of the forum selection clause, they bear the burden of showing that the public interest factors reflect "extraordinary circumstances" to defeat Defendant's motion.

To that end, Plaintiffs raise two primary arguments. First, Plaintiffs argue that the forum selection clause in the AOA only permits transfer of the matter to the Delaware Court of Chancery. Plaintiffs claim that transfer would therefore be improper because the Delaware Court of Chancery is limited to equity jurisdiction, while Plaintiffs' Complaint brings legal claims. Pl. Opp. at 14. The plain language of the forum selection clause defeats this argument. The clause states "disputes with respect to the foregoing shall be commenced and prosecuted exclusively in the Court of Chancery and any appellate courts therefrom within the State of Delaware (*or if the Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware*)." Def. Brf.; 9.3 (AOA, § 18.11 (emphasis added)). Therefore, the clause clearly provides that if the Court of Chancery does not accept jurisdiction, then the action may be brought in a Delaware state or federal court.

Second, Plaintiffs argue that Count Four (securities fraud) cannot be heard in Delaware state court because federal courts have exclusive jurisdiction over this cause of action. Pl. Opp. at 14. Count Four raises a Section 10b claim under the Securities and Exchange Act of 1934. Compl. ¶¶ 104-110. The Security and Exchange Act provides that such claims are within the exclusive jurisdiction of federal courts. *See* 15 U.S.C. § 78aa(a). Defendant does not concede this point, but argues that if the Court finds it persuasive, that the Court has inherent authority to transfer the matter to the District of Delaware. Def. Rep. at 10 n.4 (citing *Wrobleski v. Starwood Hotels &*

*Resorts Worldwide, Inc.*, No. CV 14-4670, 2015 WL 12819196, at *1 (D.N.J. Jan. 6, 2015)). The Court agrees that it possesses such authority. *See Ferens v. John Deere Co.*, 494 US 516, 529-530 (1990). Moreover, the AOA's forum selectin clause expressly indicates that a Delaware federal court is an acceptable forum if the Delaware Court of Chancery declines jurisdiction. Finally, as the Supreme Court noted in *Atlantic Marine*, the analysis pursuant to either Section 1404(a) or the doctrine of *forum non conveniens* is the same. As a result, and pursuant to Section 1404(a), the Court will transfer this matter to the United States District Court for the District of Delaware.

### III. <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss based on *forum non conveniens* (D.E. 9) is **GRANTED** but the matter is not dismissed. Instead, this case matter shall be transferred to the United States District Court for the District of Delaware. An appropriate Order accompanies this Opinion.

Dated: June 18, 2018

_____
John Michael Vazquez, U.S.D.J.